DJW/byk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

HARTFORD FIRE INSURANCE
COMPANY,

                Plaintiff,

                                              CIVIL ACTION

v.

                                              Case No.  05-2001-DJW

P & H CATTLE COMPANY, INC.,
et al.,

                Defendants.

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Hartford Fire Insurance Company ("Hartford") brings this contractual indemnity action to recover sums that it, as surety, expended in defending and settling a bond claim.  Hartford issued the bond on behalf of Defendant P & H Cattle Company, Inc. ("P & H Cattle") and the bond listed Defendant Tim Reece d/b/a Reece Cattle Company as "clearee."  Subsequent to the issuance of the bond, P & H Cattle, Emporia Livestock Sales, Inc., Olma V. Peak, and Velma Peak (collectively the "Peak Indemnity Defendants") executed a General Indemnity Agreement with Hartford.

This matter is presently before the Court on Hartford's Motion for Partial Summary Judgment (doc. 53).  Hartford seeks summary judgment on its contractual indemnity claim against the Peak Indemnity Defendants.  It contends that summary judgment is warranted on its claim for contractual indemnity because the uncontroverted material facts establish that the Peak Indemnity Defendants are jointly and severally liable under the General Indemnity Agreement for its damages.  The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons set

forth below, the motion is granted.

## I.      Material Facts

The following facts are either uncontroverted or based on evidence submitted in summary judgment papers and viewed in a light most favorable to the nonmovant. Immaterial facts and facts not properly supported by the record are omitted.

Defendant P & H Cattle was a registered livestock marketing agency or dealer required to be bonded under the Packers and Stockyards Act of 1921.[1]  Plaintiff Hartford issued P & H Cattle a bond designated as a "Bond Required of Livestock Market Agencies, Dealers and Packers under the Packers and Stockyards Act of 1921, as Amended," bearing bond number 4642567 with an effective date of June 12, 1991 ("the Bond").  The Bond listed P & H Cattle as principal and Hartford as surety.  Clause Three of the Bond states its applicability if others clear transactions through the principal, P & H Cattle:

Now, therefore, the condition of this Bond is such that:

(3)  If the said Principal, acting as a clearing agency responsible for the financial obligations of other registrants engage in buying livestock, viz:  (insert here the names of such other registrants as they appear in the application for registration),

or if such other registrants, shall (1) pay when due to the person or persons entitled thereto the purchase price of all livestock purchased by such other registrants  for their own account or for the accounts of others and (2) safely keep and properly disburse all funds coming into the hands of such Principal or such other registrants for the purpose of paying for livestock purchased for the accounts of others.

On April 13, 1993, P & H Cattle, Emporia Livestock Sales, Inc., ("Emporia Livestock") Olma V. Peak, and Velma Peak  signed Hartford's General Indemnity Agreement, although the agreement states

---

[1]7 U.S.C. § 204.

that it was "dated and effective" on June 12, 1992.  The General Indemnity Agreement provides in part:

II

This Agreement applies to all Bonds executed by the Surety (1) on which any Indemnitor either acts solely or as a member of a partnership or a joint venture, or (2) in connection with which any Indemnitor acts as a silent partner or a silent joint venturer.

III

The Indemnitors will indemnify and hold the Surety harmless from all loss, liability, damages and expenses including, but not limited to, court costs, interest and attorney's fees, which the Surety incurs or sustains (1) because of having furnished any Bond, or (2) because of the failure of an Indemnitor to discharge any obligations under this Agreement, or (3) in enforcing any of the provisions of this Agreement.

IV

On demand by the Surety, the Indemnitors will pay the Surety the amount deemed necessary by the Surety to protect itself from all losses or expenses as soon as the Surety determines that liability exists, whether or not the Surety has made any payment or created any reserve.

V

The Indemnitors shall be liable to the Surety for all payments, plus interest thereon at the maximum rate permitted by law, from the date such payments are made by the Surety in the belief that either (1) the Surety was or might be liable therefor, or that (2) they were necessary or advisable to protect the Surety's rights or to avoid or lessen the Surety's liability.

Section XIV of the General Indemnity Agreement further provides that:

The Surety may adjust, settle or compromise any claim, demand, suit or judgment upon any Bonds.  If requested by an indemnitor, the surety shall litigate such claim or demand, or defend such suit or appeal from such judgment, provided that the Indemnitor deposits with the Surety, at the time of such request, collateral satisfactory to the Surety to be used to pay any judgment rendered plus interest, costs, expenses and fees, including those of the surety.

On January 23, 1995, P & H Cattle and Hartford executed a "Rider for General Use with Bond

3

Required Under Packers and Stockyards Act, 1921, as Amended," with an effective date of January 17, 1995. The rider amended the Bond by adding Tim Reece d/b/a Reece Cattle Company as a "clearee" under clearing clause three of the Bond.

On February 14, 2001, Aaron Wilkey d/b/a A & W Cattle Company ("Wilkey") sold 225 head of fat cattle for $186,780.39, which were shipped from the Hy-plains Feedyard to Iowa Beef Processors in Emporia, Kansas for slaughter. The cattle were ultimately purchased by Holmes Livestock, who issued a check in the amount of $186,780 payable to Tim Reece. Upon receiving the check from Holmes Livestock, Tim Reece's wife endorsed the check and sent it to Wilkey's bank. The check was dishonored for payment due to insufficient funds.

On April 11, 2001, Wilkey filed two Proofs of Claim Under Surety Bond Issued Under Provisions of the Packers and Stockyards Act ("Proofs of Claim") with the United States Department of Agriculture ("USDA") for the same cattle. One Proof of Claim made a claim to Director, Division of Animal Health, Missouri Department of Agriculture under a bond issued by Great American Insurance Company on behalf of Holmes Livestock. The other Proof of Claim made a claim to Hartford under the Bond issued on behalf of P & H Cattle.

By letter dated May 4, 2001, the USDA transmitted Wilkey's Proof of Claim ("Wilkey Claim") on Hartford's bond number 4642567 issued on behalf of P & H Cattle in the amount of $186,780 for the transaction that occurred on February 14, 2001.

Upon receipt of the letter from the USDA, Hartford sent a letter dated May 14, 2001 to P & H Cattle, and Olma and Velma Peak that transmitted the Proof of Claim made by Wilkey. The letter requested that if the amount demanded was owed, they were to pay that amount directly to Wilkey. The

4

letter also stated that, if P & H Cattle and the Peaks believed that the amount claimed was not owed, they were to provide a detailed narrative explaining their position along with supporting proof and documentation. The letter also asked for a description of the proposed course of action to resolve the matter. The letter reminded P & H Cattle, and Olma and Velma Peak that they had signed a General Indemnity Agreement and that Hartford would look to each of them for any and all losses, liability, damages, and expenses that it incurred or sustained because of having furnished the Bond.

On or about May 25, 2001, Hartford received a letter from Dan E. Turner, Esq., purporting to be responding on behalf of P & H Cattle.  That letter denied the merits of Wilkey's claim under the Bond and stated that ". . . there is no coverage under the Bond and the claim is frivolous."

On June 12, 2001, Hartford sent a letter to Wilkey stating that the investigation of his claim under the Bond was ongoing.  It further advised that P & H Cattle claimed it did not act as a clearing agency for Tim Reece with respect to the transaction in question and that Mr. Reece did not buy or sell the cattle in question, and did not earn or receive a commission or other monies with respect to these cattle or the transaction.  The letter stated that both P & H Cattle and Reece denied any liability for the claim.  The letter requested copies of documents and responses to requests for information from Wilkey.

Wilkey's counsel responded to Hartford by letter dated June 20, 2001:

Your letter indicates that P & H Cattle Company did not act as a clearing agency for Tim Reece, and that Reece did not buy or sell the cattle in question, or receive a commission or other monies.  Such assertions are questionable in light of the pattern and practice of conducting several similar prior transactions.  Mr. Reece was the intermediary in the transaction, and he was presumably receiving some commission or other valuable consideration from some party in the transaction.  Moreover, in procuring the cattle sales, he was acting in the role in which he was bonded.  He did not disclose that he was not acting in a bonded capacity.  Any discrepancy between the knowledge of P & H and Reece as to what he was doing is a dispute between them, and should not affect my client.

5

> Reece was clearly acting as an intermediary on the deal and no notice of exemption from the bond was provided to my client as part of the transaction.  Finally, Reece was an endorsee on the check, creating liability for the full amount of the check pursuant to KSA § 84-3-415.

Wilkey's letter also provided responses to all of Hartford's earlier requests for information.

On June 26, 2001, Hartford sent a letter to P & H Cattle and Tim Reece asking for, among other things, a "detailed written response to [Wilkey's] June 20th letter, both factually and legally."  The letter asked P & H Cattle and Tim Reece for competent evidence, such as an affidavit, and documentation supporting their position that there was no liability under the Bond for this transaction.

On September 25, 2001, Hartford sent a letter to Wilkey's counsel, with copies to P & H Cattle and its counsel, informing him that it was denying Wilkey's claim.  The letter states:

> Although we have not received from you the documents that were to have accompanied your August 6th letter and that I requested in my August 15th e-mail to you, it is obvious that there is a significant factual dispute between the parties, as well as a genuine disagreement as to the applicability of this bond to those disputed facts.  In light of these circumstances, Hartford Fire Insurance Company cannot honor Mr. Wilkey's claim at this time.

On August 13, 2002, Wilkey filed his complaint against The Hartford Fire Insurance Company, P & H Cattle, and Tim Reece in the United States District Court for the District of Kansas, captioned *Aaron Wilkey d/b/a A & W Cattle Company vs. P & H Cattle Company, Inc. et al.*, case number 02-2376-DJW (hereinafter the "Wilkey Action").  Wilkey sought the unpaid purchase price of the cattle under the Bond from P & H Cattle, as principal, and from Hartford, as surety.  Wilkey further sought to recover the amount of the dishonored check from Tim Reece as an endorser of a negotiable instrument.

By letter dated August 21, 2002, Hartford, as surety, tendered to P & H Cattle, Olma V. Peak and Velma Peak, as principal and indemnitors, Hartford's defense of the Wilkey Action and requested that

they represent and defend Hartford at their sole cost and expense.

On September 17, 2002, Hartford sent a letter to Emporia Livestock, Olma V. Peak, and Velma Peak, putting them on notice of the claim as indemnitors under the General Indemnity Agreement and tendering the defense of the Wilkey Action.

On October 30, 2002, counsel for Hartford sent a letter to Dan Turner, Esq., confirming that he represented Emporia Livestock and Olma and Velma Peak.  The letter gave a deadline of November 4, 2002, for the indemnitors to provide written confirmation of the agreement to provide Hartford's defense, or counsel would proceed with his representation of Hartford and Hartford would seek reimbursement of any expenses incurred or amounts paid by way of indemnity under the General Indemnity Agreement.

On October 31, 2002, Mr. Turner responded to Hartford's letter to "make it perfectly clear to you and your client, Hartford, that we will represent P & H Cattle Company, Inc. We do not represent Hartford or their interest nor will we represent Tim Reece in Case No. 02-2376 CM now pending in United States District Court for the District of Kansas, Kansas City Division." The letter goes on to state that ". . . if Hartford Insurance Company wants their interests protected other than our representation of P & H Cattle Company, Inc., then they should hire their own counsel. The attorneys in my office will not be responsible in any way in regards to Hartford Insurance Company."

On October 31, 2002, Hartford's counsel sent a letter to Mr. Turner endeavoring to find out whether Mr. Turner also represented all the Peak Indemnity Defendants.

On November 1, 2002, Hartford's counsel received a letter from Dan E. Turner, Esq.  The letter stated:  "P & H Cattle Company, Emporia Livestock Sales, Inc., Olma and Velma Peak have agreed to accept the defense under the terms of the bond with Hartford Fire Insurance Company.  Their defense will

be tendered through our office and is set forth in our Answer to the [Wilkey] Petition."   In the second-to-last paragraph of the letter, Mr. Turner states:  "It is our opinion that the transaction is not covered by the bond.  Secondly, it is our understanding that the transaction set forth in [Wilkey's] Petition involves Tim Reece personally and not P & H Cattle and does not trigger the bond coverage."

Based upon this correspondence, Hartford concluded that it had no legal representation in the Wilkey Action from either P & H Cattle, the principal, or the indemnitors, Emporia Livestock, Olma V. Peak or Velma Peak.  Consequently, the Wilkey litigation proceeded with Hartford being defended by its own counsel.

In November of 2003, Hartford reached the conclusion that, under the applicable facts, the court in the Wilkey Action was more likely to conclude at trial that Tim Reece purchased the cattle either for his own account or for another's account and that there was liability under Clause Three of the Bond.  It was Hartford's analysis that, based on applicable authorities including a case cited by Wilkey, *Cook v. Hartford Accident & Indem. Co.*,[2] P & H Cattle and Hartford could be held liable on the Bond even though P & H Cattle did not know of, or participate in, the transaction.  Hartford concluded that there was a substantial risk that the court would assess liability against Hartford under the Bond.

On May 20, 2004, Mr. Turner sent the following letter to counsel for Hartford and Defendant Tim Reece:

> My client has requested I convey to you his concern about the status of this case and the legal cost of continuing with the defense.  His concerns are two-fold; (1) the chances of success and (2) the ultimate legal costs incurred.

---

[2]657 F. Supp. 762 (D. Neb. 1987).

I have explained to Scott that the chances of successfully defending the Plaintiff's claim against the bond are not good. In view of my pessimistic opinion concerning the outcome of the litigation, Scott indicated he would explore filing bankruptcy and abandon the Defense of the case to Hartford.

I have recommended to Scott to give our office an opportunity to explore the potential settlement with the Plaintiff and he has agreed to allow us to explore that possibility.

The purpose of this letter is to be completely frank as to the financial condition of my client. Hartford and Tim Reece should be fully aware that my client cannot pay any judgment rendered by the Court against the bond. Any judgment would result in the immediate filing of bankruptcy. For this reason, my client is willing to pay what he considers to be the litigation cost toward a settlement with the Plaintiff. He would request for his contribution he be released from any further claims of Hartford or anyone else.

Upon receipt of this letter, Hartford's counsel sent a letter to Mr. Turner asking him to clarify who was the client "Scott" referenced in the letter. Counsel's letter stated: "This entire matter has been pending and Hartford has incurred expenses in defending this matter based upon your declining to represent Hartford and based upon your prior opinion to us that P & H Cattle Company does not have any liability on the bond. It is very unsettling to have a complete shift of opinion after those expenses have been incurred and as trial is approaching." The letter further requested that Mr. Turner provide dates to schedule a meeting to more fully discuss the matter.

On June 4, 2004, Hartford's counsel and bond claims manager, counsel for Tim Reece, counsel for Olma and Velma Peak, and counsel for P & H Cattle attended a meeting in Emporia, Kansas. Following that meeting, Hartford sent letters to counsel for P & H Cattle and counsel for Olma and Velma Peak to follow up and confirm the discussions held at the June 4 meeting. The June 11 letter to Olma and Velma Peak stated that "[w]e discussed the merits of the case brought by Aaron Wilkey and it was agreed by all parties that the case should be resolved rather than risk the full judgment plus interest (and possible

9

attorneys' fee) in favor of the plaintiff on the bond." Hartford's June 11 letter to P & H Cattle stated "[d]uring our meeting, it was discussed that you believed a settlement of $75,000-$100,000 would be a good settlement under the facts in this case."

On June 16, 2004, Hartford's counsel sent a letter to counsel for Olma and Velma Peak that stated: "It is Hartford's intent to contact the plaintiff's attorney and make an initial offer to them of $60,000 in order to settle the claims and release the bond."

On June 18, 2004, counsel for Olma and Velma Peak responded to Hartford's letter, stating that they declined to contribute to any settlement at the present time.

On June 21, 2004, Hartford's counsel sent a letter to counsel for P & H Cattle and counsel for Olma and Velma Peak acknowledging that it had offered Wilkey $60,000 to settle the case and that counsel for Hartford anticipated hearing from Wilkey's attorney shortly.

On June 22, 2004, Hartford notified counsel for Olma and Velma Peak that it had settled a claim brought upon the Bond in the Wilkey Action for $75,000. Said sum was paid on or about June 30, 2004.

On August 5, 2004, Tim Reece paid Wilkey the equivalent of $10,889 to settle Wilkey's Claim against him.

On January 3, 2005, Hartford commenced the instant action against P & H Cattle; Emporia Livestock; Olma V. Peak; Velma M. Peak; Tim Reece d/b/a Reece Cattle Company; the Olma V.Peak and Velma M. Peak Irrevocable Trust (the "Peak Trust"); and the Peak Trust's co-trustees, Amby Scott Peak; Virginia L. Morris; and Chrysanne M. Haselhorst. Hartford claims that, as a named defendant in the Wilkey Action, it was compelled to defend itself and thereby incur legal fees and expenses. In Count I of its Complaint, Hartford asserts a claim for contractual indemnity under the General Indemnity

Agreement against the Peak Indemnity Defendants.  In Count II, it asserts a claim for common law implied indemnity against Tim Reece d/b/a Reece Cattle Company.  In Counts III and IV, it seeks to set aside fraudulent conveyances under common law and K.S.A. 33-201 *et seq.* against Olma V. Peak, Velma M. Peak, the Peak Trust; and the Peak Trust co-trustees (collectively the "Peak Trust Defendants").  In their Answer, the Peak Indemnity Defendants and Peak Trust Defendants assert a counterclaim against Hartford for negligence, and a cross claim for implied indemnity against Defendant Tim Reece d/b/a Reece Cattle Company.

## II.    Standard for Summary Judgment

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue regarding any material fact and that the moving party is entitled to judgment as a matter of law.[3]   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4]   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]   An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[6]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material

---

[3]Fed. R. Civ. P. 56(c).

[4]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[5]*Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

fact and entitlement to judgment as a matter of law.[7]   In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]   The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10]   Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11]   To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein.[12]

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every

---

[7]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[8]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

[9] *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.

[10]*Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11]*Mitchell v. City of Moore, Okla.*,, 218 F.3d 1190, 1197 (10th Cir. 2000).

[12]*Id.*

action.'"[13]

## III.    Jurisdiction

In their Response and Objection to Hartford's Motion for Partial Summary Judgment, the Peak Indemnity Defendants request that the matter be dismissed for lack of jurisdictional amount in controversy. They argue that the amount in controversy requirement, as required by 28 U.S.C. § 1332(a), is not met in this case because Hartford settled the Wilkey Action for $75,000 to the penny and it is not entitled to recover its claim for attorneys' fees and costs.

Section 1332(a)(1) of Title 28 of the United States Code grants federal courts jurisdiction over civil actions where the matter in controversy exceeds the sum or value of $75,000 and there is diversity of citizenship.[14]   For purposes of federal diversity jurisdiction, the determination of the value of the matter in controversy is a federal question to be decided under federal standards, although the courts must look to state law to determine the nature and extent of the right to be enforced in a diversity case.[15]

The United States Supreme Court in *St. Paul Mercury Indemnity Co. v. Red Cab Co.*,[16] set forth the legal certainty rule governing dismissal for failure to exceed the statutory jurisdictional amount:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith.  It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.  The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or

---

[13]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[14]28 U.S.C. § 1332(a).

[15]*Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 352-53 (1961).

[16]303 U.S. 283, 288 (1938).

oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed. Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction.[17]

Under the legal certainty rule, pleading damages in excess of the amount in controversy requirement in the complaint is sufficient to satisfy the jurisdictional requirement unless it appears to a legal certainty that the plaintiff in good faith cannot claim that amount.[18] "The test to determine amount in controversy is not the sum ultimately found to be due, but the sum demanded in good faith."[19]

In this case, Hartford prays for judgment against the Peak Indemnity Defendants for the total sum of $117,076.94 as of December 30, 2004, subject to increase for continued accrual of interest; for prejudgment interest; for its attorneys' fees and expenses of litigation of the within litigation; and for the costs of this action. The Court therefore finds that Hartford has pleaded damages in excess of the amount in controversy requirement sufficient to satisfy the jurisdictional requirement. The Court denies the Peak Indemnity Defendants' request to dismiss this case for lack of subject matter jurisdiction.

## IV.   Liability under the General Indemnity Agreement

Hartford seeks summary judgment on its contractual indemnity (Count I) claim against the Peak Indemnity Defendants because it contends the uncontroverted material facts establish that the Peak

---

[17] *Id.* at 288-90 (internal citations omitted).

[18] *St. Paul Mercury*, 303 U.S. at 288-89*; Adams v. Reliance Standard Life Ins. Co.,* 225 F.3d 1179, 1183 (10th Cir. 2000); *F & S Const. Co. v. Jensen*, 337 F.2d 160, 162 (10th Cir. 1964).

[19] *Gibson v. Jeffers*, 478 F.2d 216, 220 (10th Cir. 1973).

Indemnity Defendants are jointly and severally liable under the General Indemnity Agreement for the loss, liability, and damages and expenses which it incurred because of having furnished the Bond, because of the failure of the Peak Indemnity Defendants to discharge their obligations under the agreement, or in enforcing the provisions of the General Indemnity Agreement.

**A.      Whether the General Indemnity Agreement is a valid and enforceable contract**

The Peak Indemnity Defendants contend that the General Indemnity Agreement is not a valid and enforceable contract.  They make two arguments in support of their contention.  First, they argue that the General Indemnity Agreement is not a valid and enforceable contract because Hartford failed to sign the document.  Second, they argue that the agreement is not a valid contract because no consideration was given for the execution of the agreement.

*1.      Lack of Hartford's signature*

The General Indemnity Agreement appears to be a form, boilerplate document created by Hartford.  It was signed by Velma Peak and Olma V. Peak, in their individual capacities, and by Olma V. Peak, in his capacity as president of P & H Cattle and Emporia Livestock.  There is no indication that any representative signed the General Indemnity Agreement on behalf of Hartford.  Hartford's name and trademark, however, do appear at the top of the document.  The Peak Indemnity Defendants argue that Hartford's failure to sign the General Indemnity Agreement renders it invalid and unenforceable.

Kansas law[20] recognizes that "[s]ignature is not always essential to the binding force of an

_____

[20]Because this court is sitting in diversity, the court will apply Kansas law.  *Commerce Bank, N.A. v. Chrysler Realty Corp.*, 244 F.3d 777, 780 (10th Cir. 2001).

agreement."[21]   The object of a signature is to show mutuality or assent, but these facts may be shown in other ways; and unless a contract is required by statute or arbitrary rule to be in writing, it need not be signed, provided it is accepted and acted on.[22]   A written contract, not required to be in writing, is valid if one of the parties signs it and the other acquiesces therein.[23]   Acceptance of a contract by assenting to its terms, holding it and acting upon it, may be equivalent to a formal execution by one who did not sign it.[24]

In this case, the Court finds that Hartford's signature was not necessary for the General Indemnity Agreement to be a valid and enforceable contract.  The Court knows of no principle of contract law, and the Peak Indemnity Defendants have cited none, requiring a surety to sign its own indemnity agreement. Even under the Kansas statute of frauds,[25] which does not apply to indemnity agreements,[26] the only signature required is that of the party against whom the contract is to be enforced.[27]  As Hartford is the party seeking to enforce the General Indemnity Agreement, a document drafted by Hartford upon which its trademark and name appear at the top of the document, the Court holds that Hartford's signature was not required for it to be valid and enforceable.

---

[21] *Fey v. Loose-Wiles Biscuit Co.*, 147 Kan. 31, 75 P.2d 810, 812 (1938).

[22] 75 P.2d at 812.

[23] *Id.*

[24] *Id.  See also Atlantic Banana Co. v. Standard Fruit & S.S. Co.*, 493 F.2d 555, 559 (5th Cir. 1974) (where one party drafts and presents a contract and the other signs, the contract is valid and binding upon the offeree even where the offeror fails to sign).

[25] K.S.A. 33-106.

[26] *Patton v. Mills*, 21 Kan. 163, 1878 WL 868 (1878).

[27] K.S.A. 33-106.

2.      *Lack of consideration*

The Peak Indemnity Defendants also argue in their response to Hartford's Motion for Partial

Summary Judgment that the General Indemnity Agreement is not a valid contract because there was no

consideration given for the execution of the agreement, as no bond was contemporaneously executed at

the time of, or after execution, of the General Indemnity Agreement.

It is well settled that every contract requires consideration to be enforceable.[28]  Under Kansas law,

a written contract is presumed to be based upon valid consideration.[29]  K.S.A. 16-107 provides that "[a]ll

contracts in writing, signed by the party bound thereby, or his authorized agent or attorney, shall import a

consideration." Under this statute, the existence of consideration is presumed, and the lack of consideration

is an affirmative defense which must be proven by the defendant through substantial competent evidence.[30]

As lack of consideration is an affirmative defense, the Peak Indemnity Defendants have the burden

of raising and establishing that defense.    Although the Peak Indemnity Defendants raise lack of

consideration as a defense in their response to the Motion for Partial Summary Judgment, they failed to

assert this affirmative defense in their Answer and Counterclaim (doc. 6).  Their failure to raise lack of

---

[28]*First Nat'l Bankshares of Beloit, Inc. v. Geisel*, 853 F. Supp. 1344, 1351-52 (D. Kan. 1994) (citing *Flight Concepts Ltd. P'ship v. Boeing Co.*, 819 F. Supp. 1535, 1553 (D. Kan. 1993); *State ex rel. Ludwick v. Bryant*, 237 Kan. 47, 697 P.2d 858, 861 (1985); *Belt v. Shepard*, 15 Kan. App. 2d 448, 808 P.2d 907, 911 (1991)).

[29]*Beech Acceptance Corp., Inc. v. Air Ky. Airlines, Inc.*, No. 89-1068-K, 1990 WL 37930, at *3 (D. Kan. Mar. 16, 1990).

[30]*Bryant*, 237 Kan. at Syl. ¶ 2, 697 P.2d at 859.

17

consideration as a defense in their answer waives the defense.[31]   Even if they had raised lack of consideration as a defense in their Answer, the Peak Indemnity Defendants' argument is unavailing because the second paragraph of the General Indemnity Agreement expressly states what consideration was provided in exchange for the agreement:  "By execution of this Agreement, the Indemnitors expressly warrant their material or beneficial interest in such Bonds, and in consideration of the furnishing, procuring or continuing of such Bonds, and other good and valuable consideration, . . . ."   The Court, therefore, holds that the Peak Indemnity Defendants have failed to establish that the General Indemnity Agreement lacked consideration.  The General Indemnity Agreement is a valid and enforceable contract.

**B.      Whether the General Indemnity Agreement indemnifies Hartford for losses it incurred as surety due to Wilkey's claim under the Bond**

   *1.      Bond number referenced in Complaint*

The Peak Indemnity Defendants argue that the General Indemnity Agreement, under which Hartford seeks indemnification, does not cover the specific bond number identified in Hartford's Complaint. They point out that Hartford's Complaint seeks to recover on bond number 453990; however, that bond expired on June 12, 1991, when it was replaced by bond number 4642567. They claim that Hartford cannot assert a claim against a bond that expired on June 12, 1991 for a transaction which occurred in 2001.

Hartford maintains that the General Indemnity Agreement, the basis for its contractual indemnity claim against the Peak Indemnity Defendants, applies to all bonds it issued as surety.  Hartford explains that

---

[31]*See Federal Deposit Ins. Corp. v. Cent. Air Control, Inc.*, 785 F. Supp. 898, 901 (D. Kan. 1992) (defendants' failure to raise affirmative defense of lack of consideration in their answer waived the defense).

bond number 453990 was the original bond issued in 1985 and that it was replaced at its expiration by bond number 4642567. The top of the first page of bond number 4642567 reflects this with the following statement: "This is a True Replacement Bond 4539990[32] Hartford Accident and Indemnity Company dated June 12, 1985."

The Court has reviewed the Complaint and the Bond under which the Wilkey Claim arose (Bond 4642567) and finds that Hartford's failure to specifically reference bond number 4642567 in its Complaint is not determinative of whether it can seek and obtain indemnification on the sums expended in defending and settling the Wilkey Claim from the Peak Indemnity Defendants under the General Indemnity Agreement. The General Indemnity Agreement does not limit its applicability to specific bond numbers. Furthermore, it is apparent to the Court, from the pleadings filed in this case, that all parties should be aware that Hartford is seeking to collect sums it expended in settling and defending the Wilkey Claim on Bond 4642567, not withstanding its reference to Bond 453990 in its Complaint. Moreover, this defect could be easily cured by amendment of its Complaint to reference Bond 4642567.

At this advanced stage of litigation, when all parties should be aware that Hartford is seeking to collect sums it expended in settling and defending the Wilkey Claim on Bond 4642567, not withstanding its reference to Bond 453990 in its Complaint, the Court will construe Hartford's reference in its Complaint to Bond 453990 to include the Bond's subsequent replacement bond, Bond 4642567.

The Peak Indemnity Defendants also argue that Hartford's attempt to amend Bond 453990 to include Tim Reece d/b/a Reece Cattle Company only applied to Bond 4642567. They state that the

---

[32]The Court assumes that the additional "9" in the number referenced at the top of the bond is merely a typographical error and was meant to be "453990."

amendment was dated January 17, 1995, and occurred after the expiration of Bond 453990 on June 12, 1991. They argue that any attempt to amend Bond 453990 was ineffective to include Tim Reece d/b/a Reece Cattle Company.

Because the Court finds that the Complaint's reference to Bond 453990 instead of Bond 4642567 is not determinative of whether Hartford can seek and obtain indemnification on the sums expended in defending and settling the Wilkey Claim from the Peak Indemnity Defendants under the General Indemnity Agreement, this argument is unavailing. Because the Court is construing any reference to Bond 453990 to include its replacement Bond 4642567, the Peak Indemnity Defendants' argument that the January 17, 1995 Rider adding Tim Reece d/b/a Reece Cattle Company as a clearee to Bond 4642567 is ineffective no longer applies.

> 2.      *Whether the General Indemnity Agreement, by its own terms, applies to the Bond under which Wilkey submitted a claim*

The Peak Indemnity Defendants next contend that the General Indemnity Agreement provides no coverage because its own language limits its applicability to bonds on which any Peak Indemnity Defendant "either acts solely or as a member of a partnership or a joint venture." They argue that none of them was acting solely or as a member of a partnership or joint venture with Tim Reece d/b/a Reece Cattle Company at the time of the February 14, 2001 transaction that resulted in the Wilkey Claim under the Bond. Thus, they contend that the General Indemnity Agreement does not apply here.

The rules governing the interpretations and construction of indemnity contracts are no different than

those relating to other types of contracts.[33]  In construing a contract of indemnity and determining the rights and liabilities of the parties thereunder, the important issue to be determined is the intention of the parties, and effect should be given to that intention if such can be done consistently with legal principles.[34]  The cardinal rule of contract construction requires a court to determine the parties' intent from the four corners of the document by construing all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision, and reasonable rather than unreasonable interpretations are favored.[35]  Unless a contract is ambiguous, its meaning must be determined solely from its four corners.[36]  Whether a written instrument is ambiguous is a question of law.[37]   Language in a contract is ambiguous only when the words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings.[38]

The starting point for determining whether the General Indemnity Agreement indemnifies Hartford's losses resulting from the Wilkey Claim and Action under the Bond is Section II of the General Indemnity Agreement.  That section provides that "[t]his Agreement applies to all Bonds executed by the Surety (1)

---

[33]*Chetopa State Bancshares, Inc. v. Fox*, 6 Kan. App. 2d 326, 331, 628 P.2d 249, 255 (1981).

[34]*Id.* (citing *Missouri Pac. R.R. Co. v. City of Topeka*, 213 Kan. 658, 662, 518 P.2d 372 (1973)).

[35]*Lauck Oil Co. v. Breitenbach*, 20 Kan. App. 2d 877, Syl.¶ 2, 893 P.2d 286 (1995).

[36]*Kansas Gas & Elec. Co. v. Kan. Power & Light Co.*, 12 Kan. App. 2d 546, 551, 751 P.2d 146 (1988).

[37]*O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 576, 56 P.3d 789 (2002).

[38]*Havens v. Safeway Stores*, 235 Kan. 226 Syl. ¶ 2, 678 P.2d 625 (1984).

21

on which any Indemnitor either acts solely or as a member of a partnership or a joint venture, or (2) in connection with which any Indemnitor acts as a silent partner or a silent joint venturer." The Court further focuses on the language "[t]his Agreement applies to all Bonds . . . on which any Indemnitor either acts solely or as a member of a partnership . . . ." The issue in the Court's view is the meaning of the word "acts." Does the word "acts" refer to the act of procuring the bonds or does it refer to the act that triggers coverage under the bond and thereby gives rise to a claim for indemnification?   If the word "acts" is interpreted to mean the act of procuring a bond from the surety, then the General Indemnity Agreement would apply to the Bond if one of the Peak Indemnity Defendants acted to procure the Bond.  If the word "acts" is construed to mean acts that trigger a bond claim, however, then the General Indemnity Agreement would not apply to the Bond in this case unless Hartford demonstrated that one of the Peak Indemnity Defendants acted solely or as a member of a partnership or a joint venture with Tim Reece d/b/a Reece Cattle Company in the underlying cattle transaction that triggered the Wilkey Claim under the Bond.

The Peak Indemnity Defendants argue that under the plain meaning of this section, in order for the General Indemnity Agreement to apply to the Bond, one of the Peak Indemnity Defendants must have acted on its own, or as member of a partnership, joint venture or as a silent partner or joint venture with Tim Reece d/b/a Reece Cattle Company with respect to the transaction that triggered a claim under the Bond.  They further argue that the Section II language is a condition precedent to triggering coverage and that Hartford has not established that any of the conditions precedent have been satisfied.

Hartford argues that the Section II language does not limit its applicability as argued by the Peak Indemnity Defendants.  Instead, the subject phrases "on which any Indemnitor either acts solely or as a member of a partnership or a joint venture" and "in connection with which any Indemnitor acts as a silent

22

partner or a silent joint venturer" expand rather than restrict the definition of what bonds are covered by the General Indemnity Agreement. They go to the question of what bonds might trigger liability for the indemnitors in the context of the legal relationship of the indemnitors to each other in transactions that might be bonded in a variety of commercial settings.

Under Hartford's interpretation of section II, the General Indemnity Agreement applies to the Bond because P & H Cattle was acting solely for itself when it procured the Bond from Hartford. According to Hartford, the question of whether P & H Cattle was acting as a partner or joint venturer with Tim Reece d/b/a Reece Cattle Company in the cattle dealings that triggered liability under the Bond plays no part in the analysis.

The Court will construe all provisions of the General Indemnity Agreement together and in harmony with each other rather than critically analyzing a single or isolated section. Doing so, the Court interprets Section II's reference to "acts" to mean the indemnitor's acts of procuring a bond from the surety. Two reasons support this interpretation. First, this interpretation is consistent with other provisions of the General Indemnity Agreement, which use the "procure" language. The preamble to the General Indemnity Agreement states that "[o]ne or more of the . . . Indemnitors has requested or may request Hartford . . . to furnish or *procure* or continue contracts of suretyship, guaranty or indemnity, or other obligatory instruments, herein called "Bonds". . . ." (emphasis added). The preamble's provision addressing consideration further provides "in consideration of the furnishing, *procuring* or continuing of such Bonds . . . ." (emphasis added). Second, this interpretation is consistent with other provisions of the General Indemnity Agreement, which contain language appearing to broaden the scope of the agreement to encompass all of the bonds issued by Hartford. Section IV states that the General Indemnity Agreement

"is a continuous Agreement which remains in full force and effect as to every Bond issued by the Surety." This interpretation is more reasonable than the one advanced by the Peak Indemnity Defendants.

Under this interpretation of Section II, the General Indemnity Agreement applies to all bonds executed by Hartford on which any Peak Indemnity Defendant acted to procure. The record establishes that P & H Cattle acted to procure the Bond under which the Wilkey Claim arose. No party disputes that P & H Cattle was a registered livestock marketing agency or dealer required to be bonded under the Packers and Stockyards Act or that Hartford issued the Bond on P & H Cattle's behalf. Moreover, the preamble to the General Indemnity Agreement recites that the Peak Indemnity Defendants "requested or may request Hartford . . . to furnish, procure or continue contracts of suretyship, guaranty or indemnity, or other obligatory instruments . . . ." Based on these facts, the Court can reasonably infer that one of the Peak Indemnity Defendants acted to procure the Bond issued on behalf of P & H Cattle from Hartford.

In accordance with the Court's determination that Section II of the General Indemnity Agreement applies to all Bonds executed by Hartford on which one of the Peak Indemnity Defendant acted in procuring the Bond, the Court concludes as a matter of law that the General Indemnity Agreement, by its own terms, applies to the Bond under which Wilkey's claim arose.

### C.    Whether a genuine issue of material fact exists as to whether Hartford acted reasonably and in good faith as surety in settling the Wilkey Claim and Action

Having concluded that the General Indemnity Agreement covers the Bond under which Hartford expended sums in settling and defending the Wilkey Claim and Action, the Court next must determine whether Hartford acted reasonably and in good faith as surety in settling the Wilkey Claim and Action.

Hartford contends that it has fulfilled its implied obligation of good faith and fair dealing as surety

24

on the Bond by demonstrating that its conduct with regard to the bond claim was reasonable.  It argues that the uncontroverted facts of this case show that reasonableness has been established as a matter of law. It asserts that there are no genuine issues of material fact that the Peak Indemnity Defendants refused to either settle the Wilkey Action directly with Wilkey or request that Hartford defend the Wilkey Claim by posting collateral to cover potential losses to Hartford.  It submits that, as a matter of law, it has demonstrated the utmost good faith and fair dealing, thus meeting the standard of reasonableness.

In *Hartford v. Tanner*,[39] the Kansas Court of Appeals affirmed the trial court's award of summary judgment against a surety based on its finding that the surety's actions in paying the bond claims were unreasonable.[40]  In its opinion, the court directly addressed the issue of what good faith standard should be used to determine the implied obligation of a surety seeking to enforce an indemnity agreement.  After discussing how various jurisdictions have addressed the good faith obligation of a surety seeking indemnification, the court agreed with the cases holding that the implied covenant of good faith requires a surety seeking indemnification to show that its conduct was reasonable.[41]  Applying this reasonableness standard to the surety's conduct, the court found that the surety had failed to conduct a thorough investigation, and simply paid the bond claims and sought indemnification.[42]  The court noted that the surety made no attempt to mitigate the claims on the bonds and had even paid the claims after the indemnitor had

---

[39]22 Kan. App. 2d 64, 72-74, 910 P.2d 872, 878-79 (1996).

[40]*Id.* at 79, 910 P.2d at 882.

[41]*Id.* at 76, 910 P.2d at 880.

[42]*Id.* at 76, 910 P.2d at 881.

filed a petition of protest.[43]

Thus, under the law established by *Tanner*, a duty of good faith is implied in indemnification agreements, and that duty requires the surety to show that its conduct with regard to a bond claim was reasonable.[44]  Although the *Tanner* court did not set forth a specific list of factors for a court to consider in evaluating whether the surety's conduct in paying the bond claims was reasonable, certain factors can be extracted from the case, such as the thoroughness of the investigation performed by the surety, the cooperation or lack thereof by the principal,[45] and whether the surety made attempts to mitigate the claims.

Keeping the *Tanner* principles in mind, the Court has reviewed the Affidavit of Hartford's Bond Claim Manager, Lana Glovach, as well as the correspondence attached as exhibits A-1 through A-26 to Hartford's Motion for Partial Summary Judgment.  The Court finds that Hartford has demonstrated that its conduct was reasonable with regard to the Bond claim.  First, the evidence demonstrates that Hartford made repeated efforts in investigating Wilkey's claim on the Bond.  Second, the evidence shows that the Peak Indemnity Defendants did little to cooperate with Hartford's requests for information.  Third, the evidence supports a finding that Hartford made efforts to mitigate the claim on the Bond.  Fourth, there is no evidence that any of the Peak Indemnity Defendants advised Hartford that they opposed settlement of the Wilkey Claim and Action.

        *1.      Hartford's investigation efforts and lack of cooperation by indemnitors*

---

[43]*Id.*, 910 P.2d at 881.

[44]*Id.*, 910 P.2d at 881.

[45]*Id.* at 76, 910 P.2d at 880 (citing John W. Hinchey, *Surety's Performance Over Protest of Principal: Considerations and Risks*, 22 Tort & Ins. L.J. 133, 149 (1986)).

From the exchange of correspondence, it is clear that Hartford made repeated attempts obtain information from Wilkey and the Peak Indemnity Defendants in investigating Wilkey's Claim under the Bond, notwithstanding the Peak Indemnity Defendants lack of responsiveness to Hartford's inquiries. Upon receipt of the initial letter from the USDA submitting Wilkey's Proof of Claim, Hartford sent a letter dated May 14, 2001 to P & H Cattle, Olma Peak, and Velma Peak that transmitted the Proof of Claim made by Wilkey and requested that, if the amount demanded was owed, they pay that amount directly to Wilkey. If, on the other hand, they believed that the amount claimed was not owed, they were to provide a detailed narrative explaining their position along with supporting proof and documentation. This letter also asked for a description of the proposed course of action to resolve the matter. The letter additionally reminded P & H Cattle, Olma and Velma Peak that they had signed a General Indemnity Agreement and that Hartford would look to each of them for any and all losses, liability, damages, and expenses that it incurred or sustained because of having furnished the Bond.

After receiving an one-paragraph letter from counsel purporting to be responding on behalf of P & H Cattle which stated that there was no coverage under the Bond and that the Wilkey Claim was frivolous, Hartford sent a letter to Wilkey, stating that the investigation of his claim under the Bond was ongoing. The letter advised Wilkey that P & H Cattle claimed it did not act as a clearing agency for Tim Reece with respect to the transaction in question and that Mr. Reece did not buy or sell the cattle in question, or earn or receive a commission or other monies with respect to the cattle or the transaction. The letter stated that both P & H Cattle and Reece denied any liability for the claim. The letter requested copies of documents and responses to requests for information from Wilkey.

Wilkey thereafter sent Hartford a letter that questioned some of Hartford's earlier claims and

27

assertions.  The letter also provided responses to Hartford's earlier requests for additional information.

Upon receipt of Wilkey's response, Hartford sent letters to P & H Cattle and Tim Reece asking for "a

detailed written response to [Wilkey's] June 20th letter, both factually and legally."  In the letter, Hartford

asked P & H Cattle and Tim Reece to provide competent evidence, such as an affidavit, and

documentation supporting their position that there was no liability under the Bond for the underlying

transaction.

After hearing nothing for three months from the Peak Indemnity Defendants or Tim Reece, Hartford

sent another letter to Wilkey stating that it was denying his claim under the Bond.  The letter stated, in part:

"It is obvious that there is a significant factual dispute between the parties, as well as a genuine disagreement

as to the applicability of this bond to those disputed facts."  The record shows that Hartford or its counsel

sent over fourteen letters to either Wilkey or the Peak Indemnity Defendants regarding Wilkey's claim

under the Bond.  Based on the record, the Court therefore finds that Hartford made repeated attempts to

investigate the Wilkey Claim and that the Peak Indemnity Defendants exhibited a low level of

responsiveness to Hartford's investigation attempts.

### 2.    Mitigation efforts

The record also establishes that Hartford made efforts to mitigate the claim on the Bond from the

original amount sought of $186,780 to the amount ultimately paid to settle Wilkey's Claim, $75,000.

Wilkey's Proof of Claim on the Bond sought to recover the $186,780 unpaid purchase price for his cattle.

After Hartford denied his claim on the Bond, Wilkey brought the Wilkey Action against Hartford, P & H

Cattle, and Tim Reece, again seeking the full $186,780 amount of the Bond claim.   Three years after

Hartford received notice of the Wilkey Claim, and after it received a letter from counsel for P & H Cattle

that stated "the chances of successfully defending [Wilkey's] claim against the bond are not good," and

referenced counsel's "pessimistic opinion concerning the outcome of the litigation," Hartford began

discussions to settle the Wilkey Claim.  It offered Wilkey $60,000 to settle the case, but ultimately settled

Wilkey's Claim under the Bond for $75,000.  These facts support the Court's finding that Hartford made

efforts to mitigate the Wilkey Claim under the bond.

### 3.    Opposition to Settlement

Lastly, the Court finds the Peak Indemnity Defendants have presented no evidence that they

protested or opposed settlement of the Wilkey Claim and Action prior to Hartford's settling the claim for

$75,000 on their behalf.  Hartford's counsel and bond claims manager, counsel for Tim Reece, counsel

for Olma and Velma Peak, and counsel for P & H Cattle were all present at the June 4, 2004 meeting in

Emporia, Kansas, where settlement of the Wilkey Claim and Action was discussed.  Following that

meeting, Hartford sent follow-up letters to counsel for P & H Cattle and counsel for Olma and Velma Peak

to confirm the settlement discussions held at the June 4 meeting.   The June 11 letter to Olma and Velma

Peak confirming the June 4 discussions stated that "[w]e discussed the merits of the case brought by Aaron

Wilkey and it was agreed by all parties that the case should be resolved rather than risk the full judgment

plus interest (and possible attorneys' fee) in favor of the plaintiff on the bond."  The June 11 letter to P &

H Cattle stated "[d]uring our meeting, it was discussed that you believed a settlement of $75,000-$100,000

would be a good settlement under the facts in this case."

Hartford followed with a letter to counsel for Olma and Velma Peak dated June 16, 2004, advising

that "[i]t is Hartford's intent to contact the [Wilkey's] attorney and make an initial offer to them of $60,000

in order to settle the claims and release the bond."  In response, counsel for Olma and Velma Peak sent

a letter to Hartford stating that they declined to contribute to any settlement at the present time.

Finally, on June 21, 2004, Hartford sent a letter to counsel for P & H Cattle and counsel for Olma and Velma Peak acknowledging that it had offered Wilkey $60,000 to settle the case and that counsel for Hartford anticipated hearing from Wilkey's attorney shortly.  Upon hearing nothing, the next day Hartford notified counsel for Olma and Velma Peak that it had settled the Wilkey Action for $75,000.

These facts show that the Peak Indemnity Defendants had opportunities to object or protest Hartford's settlement of the Wilkey Claim and Action.  There is no evidence in the record that any of the Peak Indemnity Defendants communicated any opposition to the settlement negotiated on their behalf by Hartford.

In their response to Hartford's Motion for Partial Summary Judgment, the Peak Indemnity Defendants do not expressly argue that Hartford's conduct under the Bond claim was unreasonable. Instead, the Peak Indemnity Defendants argue that they should not be held liable under the General Indemnity Agreement for sums Hartford expended in defending and settling the Wilkey Claim and Action because (1) Tim Reece was not properly added to the clearing coverage of the Bond as he never filed an application for registration, (2) Wilkey's complaint in the Wilkey Action asserted a claim against "Tim Reece" not "Tim Reece d/b/a Reece Cattle Company," (3) Wilkey made a claim against Holmes and could only collect on one bond claim, (4) Wilkey settled with Holmes and was estopped from recovering under the Bond because he had already recovered from Holmes, (5) Wilkey's complaint asserted a claim against "The Hartford Insurance Company," rather than the correct name of "Hartford Insurance Company," and (6) Tim Reece was acting as Wilkey's agent in the underlying transactions.

The Court has carefully considered these arguments, and rejects them.  Under *Tanner*, a surety

seeking to enforce an indemnity agreement need only show that its conduct with regard to the bond claim was reasonable.  A surety is not required, as implied by the Peak Indemnity Defendants' arguments, that it show that the bond claim was valid or that the bond claimant would have prevailed on its claim against the surety.[46]

The Court finds that based on the uncontroverted facts and competent evidence, Hartford has demonstrated that its conduct was reasonable with regard to Wilkey's Claim under the Bond issued on behalf of P & H Cattle and under which Tim Reece d/b/a Reece Cattle Company was listed as a "clearee" on the bond.  The Court will therefore grant summary judgment in favor of Hartford on the contractual indemnity claim against the Peak Indemnity Defendants.

## V.      Whether Hartford is Entitled to Recover its Attorney Fees and Litigation Expenses

### A.      Whether the version of K.S.A. 58-2312 in effect at the time the General Indemnity Agreement was signed nullifies the attorney fee provision

As part of its claim for contractual indemnity (Count I) under the General Indemnity Agreement,

---

[46]*See Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983) (under the letter of the contract, surety had the right to reimbursement for payments made in good faith, whether or not liability existed); *Commercial Ins. Co. of Newark v. Pacific-Peru Constr. Corp.*, 558 F.2d 948, 952 (9th Cir.1977) (argument that surety suffered no actual liability under its bond and was therefore a "volunteer" provided no defense to indemnification under the express language of the surety agreement); *Fireman's Fund Ins. Co. v. Nizdil*, 709 F.Supp. 975, 977 (D. Or. 1989) (indemnification depends upon interpretation of the indemnity contract and not on the validity or enforceability of the bond); *United States for the Use of Int'l Brotherhood of Elec. Workers v. United Pac. Ins. Co.*, 697 F. Supp. 378, 381 (D.Idaho 1988) (defendant cannot escape liability by arguing he did not sign the bond when he did sign the surety agreement which is the document in question); *Employers Ins. of Wausau v. Able Green, Inc.*, 749 F. Supp. 1100, 1103 (S.D. Fla.1990) (surety is entitled to reimbursement for payments made in good faith , regardless of whether any liability actually existed).

Hartford seeks to recover, among other sums expended, its attorney fees and litigation expenses incurred in the Wilkey Action, as well as attorney fees and expenses of litigation incurred in the current action to enforce the provisions of the agreement.

The General Indemnity Agreement contains an attorney fee provision. Section III of the agreement provides that the Peak Indemnity Defendants will indemnify and hold Hartford harmless from "all loss, liability, damages and expenses including, but not limited to, court costs, interest and attorney's fees, which the surety incurs or sustains (1) because of having furnished any Bond, or (2) because of the failure of an indemnitor to discharge any obligations under this Agreement, or (3) in enforcing any of the provisions of the Agreement." The Peak Indemnity Defendants claim, however, that Hartford is not entitled to recover or claim attorney fees under the General Indemnity Agreement because the version of K.S.A. 58-2312 in effect at the time the agreement was signed nullified these type of attorney fee provisions.

At the time the General Indemnity Agreement was signed by the Peak Indemnity Defendants in April 1993, K.S.A. 58-2312 provided, in pertinent part:

> Hereafter it shall be unlawful for any person or persons, company, corporation or bank, to contract for the payment of attorney's fees in any note, bill of exchange, bond or mortgage; and *any such contract or stipulation for the payment of attorney's fees shall be null and void*; and that hereafter no court in this state shall render any judgment, order or decree by which any attorney's fees shall be allowed or charged to the maker of any promissory note, bill of exchange, bond, mortgage, or other evidence of indebtedness by way of fees, expenses, costs or otherwise: Provided, That in all existing mortgages wherein no amount is stipulated as attorney's fees, not more than eight percent on sums of two hundred and fifty dollars or under, and not more than five percent on all sums over two hundred and fifty dollars, shall be allowed by any court as attorney's fees: And provided further, That this act shall not apply to existing mortgages wherein any sum has been stipulated

32

as attorney's fees.[47]

K.S.A. 58-2312 was thereafter amended in 1994 and the provision that nullifies contracts or stipulations for the payment of attorney's fees in notes, bills of exchange, bonds or mortgages was removed.

Hartford argues that K.S.A. 58-2312 does not nullify the attorney fee provision of the General Indemnity Agreement because the version of K.S.A. 58-2312 in effect at the time the agreement was signed, by its plain language, only applies to notes, bills of exchange, bonds, or mortgages. Nowhere in the statute does it reference indemnity agreements, which are quite distinct from notes, mortgages, and other credit agreements.

The Peak Indemnity Defendants cite the Kansas Court of Appeals decision, *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*,[48] in support of their argument that the pre-1994 K.S.A. 58-2312 nullifies the General Indemnity Agreement's attorney fee provision. *Ryco* involved a guaranty agreement with a provision that the guarantors would be liable for "all attorneys' fees, court costs and other costs and expenses incurred by Creditor in connection with the collection of such Note . . . or any renewal, extension, modification or consolidation thereof."[49] In that case, the court held that at the time the guaranty agreement at issue was signed, K.S.A. 58-2312 nullified attorney fee provisions in guaranty contracts and made those provisions void and unenforceable.[50] The guarantors' liability was therefore limited to the underlying debt

---

[47]K.S.A. 58-2312 (emphasis added).

[48]*Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 23 Kan. App. 2d 30, 926 P.2d 669 (1996).

[49]*Id.* at 42, 926 P.2d at 678.

[50]*Id.* at 45, 926 P.2d at 679.

and interest thereon.[51]

*In re Dvorak*,[52] Judge Robinson, sitting in her capacity as bankruptcy judge, directly addressed the question of whether the language of pre-1994 K.S.A. 58-2312 precluded an award of attorney fees under an indemnity agreement. The court analyzed the statute's reference to "promissory note, bill of exchange, bond, mortgage, or other evidence of indebtedness."[53] After a thorough comparison of these instruments with an indemnity agreement, the court held that an indemnity agreement is materially different from a guaranty agreement or a surety agreement, it is not a "note" within the meaning of K.S.A. 58-2312, nor is it evidence of indebtedness or a "bond."[54] The court held that the language of pre-1994 K.S.A. 58-2312 nullifying attorney fee provisions in "promissory note, bill of exchange, bond, mortgage, or other evidence of indebtedness" did not apply to attorney fee provisions in an indemnity agreement.[55]

In accordance with *Dvorak*, the Court finds that the pre-1994 version of K.S.A. 58-2312 does not nullify the attorney fee provision of the General Indemnity Agreement.

### B.    What attorney fees are recoverable by Hartford?

Hartford also claims that as a matter of law, it is entitled to recover the attorney fees which it has incurred in enforcing the terms of the General Indemnification Agreement. The Peak Indemnity Defendants argue that the General Indemnification Agreement does not cover such costs.

---

[51]*Id.*, 926 P.2d at 679.

[52]176 B.R. 929, 932 (Bankr. D. Kan. 1994).

[53]*Id.*

[54]*Id.* at 932-34.

[55]*Id.* at 934.

Under Kansas law, the prevailing party in a lawsuit may recover attorneys' fees where the fees are specifically authorized by statute or contract.[56]    As there is no statute authorizing an award of attorney fees here, the Court must determine whether the General Indemnity Agreement authorizes an award.

Under the express terms of the General Indemnity Agreement, the Peak Indemnity Defendants agreed to indemnify Hartford "from all loss, liability, damages and expenses including, but not limited to, court costs, interest and attorney's fees, which the Surety incurs or sustains (1) because of having furnished any Bond, or (2) because of the failure of an Indemnitor to discharge any obligations under this Agreement, or (3) in enforcing any of the provision of the Agreement."[57]

The language of the General Indemnity Agreement is clear that it covers court costs, interest and attorney's fees which Hartford incurs or sustains "in enforcing any of the provision of the Agreement." Hartford is therefore entitled to recover its attorney fees, court costs, and interest incurred in enforcing its right to indemnity from the Peak Indemnity Defendants.  The parties are accordingly directed to comply with D. Kan. Rule 54.2 regarding the procedure for awarding attorney's fees.[58]  If the parties reach an agreement with regard to the attorney fee amount, they shall file an appropriate stipulation and request for an order. If they are unable to agree, Hartford shall file the statement of consultation required by this rule and a supplemental statement itemizing the fees expended in defending the indemnified claim, negotiating

---

[56]*Missouri Pac. R.R. Co. v. Kan. Gas & Elec. Co.*, 862 F.2d 796, 801 (10th Cir. 1988) (citing *Farmers Cas. Co. v. Green*, 390 F.2d 188, 192 (10th Cir. 1968); *Oak Park Inv. Co. v. Lundy's, Inc*., 6 Kan. App. 2d 133, 626 P.2d 1236, 1237 (1981)).

[57]Emphasis added.

[58]Although D. Kan. Rule 54.2 sets forth the procedure for awarding statutory attorney's fees, the Court will utilize the same procedure to determine the amount of attorney fees under the General Indemnity Agreement.

the claim, settling the claim, and enforcing the provisions of the General Indemnity Agreement.  Other parties shall have 10 days in which to file a response to the statement.  The supplemental statement shall be supported by time records, affidavits, or other evidence.

## IV.    Peak Indemnity Defendants' Counterclaim Against Hartford

Hartford also requests that the Court dismiss or grant summary judgment in its favor on the negligence counterclaim asserted by the Peak Indemnity Defendants because the counterclaim is simply a restatement of their affirmative defenses to liability in the Wilkey Action.

In their counterclaim, the Peak Indemnity Defendants assert that Hartford was negligent in the handling of the Wilkey Claim under the Bond.  They claim that they had nothing to do with the transaction between Wilkey and Tim Reece and that only due to the negligence of Hartford in its handling of the Wilkey Claim, which resulted in Hartford settling the Wilkey Action, they suffered damages.  The Peak Indemnity Defendants' response to Hartford's Motion for Partial Summary Judgment does not address Hartford's request for dismissal or summary judgment on their negligence counterclaim.

Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs.[59]  If recovery is to be had for such negligence, the party seeking to recover must show:  (1) a causal connection between the duty breached and the injury received; and (2) the party was damaged by the negligence.[60]  Whether a duty exists is a question of law.[61]  Whether the duty has been breached is a

---

[59]*Lay v. State Dept. of Transp.*, 23 Kan. App. 2d 211, 214, 928 P.2d 920, 923 (1996).

[60]*Id.* at 214, 928 P.2d at 923.

[61]*Id.* at 215, 928 P.2d at 923-24.

question of fact.[62]

Summary judgments are to be granted with caution in negligence actions.[63]  This, however, does not mean the moving party has to prove in its summary judgment motion that it was not negligent.[64]  A moving party is entitled to prevail if it could establish that there was an absence of evidence to support the non-moving party's claim.[65]   The United States Supreme Court articulated this principle when analyzing the import of Federal Rules of Civil Procedure 56(a)-(c) in *Celotex Corp. v. Catrett*:[66]

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.[67]

Applying these standards, Hartford, the moving party, is not required to prove in its summary judgment motion that it was not negligent.  Instead, Hartford is entitled to prevail if it can establish that there is an absence of evidence to support the Peak Indemnity Defendants' negligence counterclaim.

The Court finds that the Peak Indemnity Defendants have failed to make a showing sufficient to

---

[62]*Id.*, 928 P.2d at 924.

[63]*Fettke v. City of Wichita,* 264 Kan. 629, 632, 957 P.2d 409 (1998)

[64]*Crooks for Williams v. Green*, 12 Kan. App. 2d 62, 64, 736 P.2d 78, 80 (1987).

[65]*Id.* at 65, 736 P.2d at 80.

[66]477 U.S. 317, 322-23 (1986).

[67]*Id.*

establish that Hartford owed them any duty, an element essential to their negligence counterclaim and on which they bear the burden of proof at trial.  This failure of proof concerning an essential element of the Peak Indemnity Defendants' negligence claim renders all other facts immaterial.  Hartford is therefore entitled to judgment as a matter of law because the Peak Indemnity Defendants have failed to make a sufficient showing on an essential element of their case with respect to which they have the burden of proof. The Court will therefore grant Hartford's Motion for Partial Summary Judgment on the Peak Indemnity Defendants counterclaim.

**IT IS THEREFORE ORDERED** that Plaintiff Hartford's Motion for Partial Summary Judgment (doc. 53) is granted.

**IT IS FURTHER ORDERED** that the Court finds as a matter of law that the General Indemnity Agreement is a valid and enforceable agreement between Hartford and the Peak Indemnity Defendants. The Court further finds that under the provisions of the General Indemnity Agreement, Hartford, as surety, is entitled to recover its court costs, interest and attorney fees incurred in defending and settling the Wilkey Claim and Action and in enforcing the provisions of the General Indemnity Agreement against the Peak Indemnity Defendants.

**IT IS FURTHER ORDERED** that the parties are directed to comply with District of Kansas Rule 54.2 regarding the procedure for awarding attorney's fees.  If the parties reach an agreement with regard to the attorney fee amount, they shall file an appropriate stipulation and request for an order. If they are unable to agree, Hartford shall file the statement of consultation required by this rule and a supplemental statement itemizing the fees expended in defending the indemnified claim, negotiating the claim, settling the claim, and enforcing the provisions of the General Indemnity Agreement.  Other parties shall have 10 days

in which to file a response to the statement.  The supplemental statement shall be supported by time records, affidavits, or other evidence.

**IT IS FURTHER ORDERED** that summary judgment is granted against the Peak Indemnity Defendants on their negligence counterclaim asserted against Hartford.

**IT IS FURTHER ORDERED** that the jury trial setting of August 14, 2006 is hereby vacated. A telephone status conference is scheduled for **<u>August 14, 2006 at 1:30 p.m.</u>** to discuss further action to be taken on Counts III and IV of the Complaint.

**IT IS SO ORDERED**.

Dated this 28th day of July, 2006, in Kansas City, Kansas.

s/ David J. Waxse
David J. Waxse
U. S. MAGISTRATE JUDGE

cc:   All counsel